965 So.2d 334 (2007)
STATE of Florida, Appellant,
v.
Lorraine GRAYSON, Appellee.
No. 5D06-3131.
District Court of Appeal of Florida, Fifth District.
September 21, 2007.
Bill McCollum, Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellant.
Mark S. Blechman of Mark S. Blechman, P.A., Orlando, for Appellee.
GRIFFIN, J.
The State appeals an order granting Appellee, Lorraine Grayson's ["Grayson"] motion to dismiss an information. We reverse.
The State filed an information against Grayson, alleging that on October 14, 2004, Grayson "knowingly and willfully" made a false report of child abuse in violation of sections 39.01(27) and 39.205(6), Florida Statutes (2004). Grayson moved to dismiss *335 the information on the ground that the Department of Children and Family Services ["DCF"] had revealed her identity in violation of her statutory right to confidentiality. Following an evidentiary hearing, the trial court entered an order dismissing the information. Grayson, a Florida Highway Patrol trooper, conducted a traffic stop of a vehicle occupied by Cynthia Shattuck and her two minor children on September 16, 2004. Ms. Shattuck was issued a citation for speeding. According to Grayson's notes, Shattuck disputed that she was speeding and told Grayson that she was on her way to pick up a foster child. As soon as Ms. Shattuck pulled away from the area of the traffic stop, she contacted the Florida Highway Patrol to file a complaint against Grayson for rude and discourteous behavior. The complaint was assigned to an investigating sergeant to conduct an inquiry. The sergeant met with Grayson on October 11, 2004, to discuss the complaint. The complaint was ultimately classified as "not sustained."
On October 12, 2004, the next day, Grayson contacted DCF's abuse hotline and made a complaint against Ms. Shattuck, referencing the date of the traffic stop. Grayson alleged that Ms. Shattuck was a foster parent and the children were in danger. Specifically, Grayson stated: "There is a concern for the children in the care of the foster mother, Cynthia Shattuck. The mother was stopped for speeding and she was yelling and screaming at the officer in the presence of the children. As a result, the female child, approximately twelve years old, who was in the front seat, appeared to be "very scared and fragile." In the call to the hot line, Grayson did not identify herself.[1]
DCF assigned Investigator Lawrence Palmer to investigate the abuse allegation; he testified at the evidentiary hearing about his visit to the Shattuck residence and interview with the family. He did not disclose Grayson's identity as the reporter of abuse to the Shattucks. He did not know who made the report. Investigator Palmer testified that he "interviewed them in regards to the report that I received." He first determined that the children were not foster children. Then he addressed the particular allegations of the report by reading to Ms. Shattuck directly from the hotline abuse report. He inquired about the events surrounding the traffic stop and requested to see the citation Ms. Shattuck was issued. He testified that he wanted to check for any correlation between the report and the citation, especially the dates. He also said he always gets all the physical evidence he can. Ultimately, DCF concluded their investigation, finding "no credible evidence" existed to support the abuse complaint. Immediately after Investigator Palmer left the Shattuck residence, Ms. Shattuck filed a complaint against Grayson for filing a false abuse report.
At issue is whether it was improper for Investigator Palmer to have inquired into the details of the traffic stop if doing so disclosed Grayson's identity. The State contends that, given the nature of the abuse allegations in the hot line abuse report, it was inevitable that when Investigator Palmer asked Ms. Shattuck about the traffic stop, Ms. Shattuck would be able to figure out who had called the hotline. The State contends alternatively that even if Investigator Palmer unlawfully disclosed Grayson's identity, dismissal of the criminal charge for filing a false report, *336 thereby insulating Greyson from prosecution, was not an appropriate or available remedy. See Simmons v. State, 887 So.2d 1283, 1285 (Fla.2004).
The trial court concluded that, because Investigator Palmer's stated purpose for the investigation was to determine whether the children were in a foster home and whether the children were in danger on the date of the investigation, Investigator Palmer's inquiries into the traffic stop and his request for a copy of the citation issued by Grayson were "unnecessary." By "unnecessarily" asking questions about the contents of the abuse report and by asking about a citation, Investigator Palmer "disclosed" Grayson's identity in violation of section 39.202(5). The court found that an information based on a violation of section 39.202(5) is "invalid and must be dismissed."
The problem in this case arises from the competing considerations contained in Part II (Reporting Child Abuse) and Part III (Protective Investigations) of Chapter 39. On the one hand, Chapter 39 contains several provisions designed to encourage persons who suspect abuse to report it, mainly by offering anonymity and confidentiality. On the other hand, the prompt, vigorous and skillful investigation of reports is mandated. The dilemma is how to conduct an effective investigation of an abuse report without revealing information that might allow the accused abuser to guess who may have made the report.
Several sections of Chapter 39 are relevant. Section 39.202(1), Florida Statutes (2004), provides that all calls to the central abuse hotline are confidential, but after a person is determined to have made a false report, that person is no longer entitled to confidentiality. See also §§ 39.205(5), 206(9), Fla. Stat. (2004). Section 39.202(5) provides for limited release of the name of the person reporting the abuse to certain department employees and law enforcement. Section 39.301(5)(a)2, Florida Statutes (2004), requires a child protective investigator to inform any subject of an investigation of the purpose of the investigation. Sections 39.202(8) and 39.205(3) make it a second-degree misdemeanor to knowingly and willfully disclose confidential information from the abuse hotline to an unauthorized person, while section 39.205(6) provides that a person who knowingly and willfully makes a false report of child abuse is guilty of a third-degree felony. Section 39.01(27) defines "false report" as "a report of abuse, neglect, or abandonment of a child to the central abuse hotline which report is `maliciously made' for specified purposes such as harassment or acquiring custody of a child." The burden is on DCF to determine if a false report has been made. See § 39.205(4) & (5), Fla. Stat. (2004). If DCF determines that a report is false, then it refers the report to law enforcement.
Common sense dictates that an investigator must be able to disclose enough information to allow an adequate investigation. Chapter 39 requires the accused abuser to be told the "purpose of the investigation" and it forbids revelation of the "name" of the reporter, but it does not fill in the interstices. Investigator Palmer testified that people being investigated by DCF often figure out who called in the report based on the allegations of abuse. When Grayson called the abuse hotline, she said:
"[T]here is a concern for the children in the care of the foster mother, Cynthia Shattuck. The mother was stopped for speeding and she was yelling and screaming at the officer in the presence of the children. As a result, the female child, approximately 12 years old, who *337 was in the front seat, appeared to be very scared and fragile.
It is hard to imagine how this event could be investigated without the subject figuring out that the person who reported the abuse was the only other adult present by the side of the road during the traffic stop. The trial court sidestepped this issue by seizing on deposition testimony of Investigator Palmer that he was concerned with the children's well-being at the time of the investigation, presumably suggesting that Investigator Palmer had no business mentioning the abuse report at all.[2]
The trial court suggested that the case of State v. White, 867 So.2d 594 (Fla. 2d DCA 2004), authorized dismissal of the information in this case. In White, the State appealed an order suppressing evidence in a prosecution for making a false report of child abuse. The State had filed an information against White, alleging a knowing, willful, and malicious making of a false report of child abuse in violation of section 39.205(6), Florida Statutes. White had made an anonymous call to DCF's central abuse hotline, which DCF investigated and determined to be unfounded. Afterward, the father contacted the DCF investigator to find out who had made the report, and the investigator informed the father that he could not disclose that information.
After the investigator refused to give the father any information about the caller, the father went to the St. Petersburg Police Department. At the father's urging to prosecute, the detective obtained an audiotape of the hotline call from DCF. He played the tape for the father and daughter so that they might identify the voice. They identified White as the caller, the police confronted him with this information, and she admitted that she made the call. When White was charged, she filed a motion to suppress, alleging that DCF and the detective had acted illegally and had violated section 39.202(4) by making available an audiotape of her child abuse hotline call to the subjects of the abuse report for the purpose of identifying her as the caller. The trial court entered an order suppressing the audiotape of the hotline call, any transcript of the call, the voice identification of White as the caller and statements that White made to the police after she was questioned as a result of the identification made by the subjects of the report.
The Second District affirmed, agreeing with the lower court that law enforcement was prohibited from publishing a copy of the anonymous hotline call to the father and daughter for the purpose of identifying the caller. Although the detective did not disclose the name of the caller, the Second District concluded that disclosure of the audiotape of the caller's voice was tantamount to disclosing the caller's name. The White court pointed out that the detective's stated reason for playing the tape for the father and daughter was to determine the identity of the caller. For the reasons that follow, we conclude that the White case neither required nor authorized the order dismissing this case.
In White, the report of abuse had already been investigated and deemed to be unfounded. The investigation was undertaken *338 by the police to determine the name of the alleged false reporter. The Second District Court of Appeal concluded, under those circumstances, that it was preferable to frustrate a criminal investigation for a false report of child abuse than to chill abuse reports by allowing the criminal investigator to disclose the identity of the caller to the alleged abuser in order to obtain the caller's name. That is not what we have in this case. This was an inquiry by DCF into the question whether a child had been abused or was at risk, so different competing values are at stake. Frustration of an investigation undertaken to uncover a false child abuse report is very different from frustration of the investigation of child abuse. White sensibly says that we should not discourage reports of abuse by condoning disclosures of the reporter's identity in order to punish false reports, but we also must not so constrain investigations of abuse that investigators are unable to assess whether the child abuse reported to the hotline did, in fact, occur. An investigator who knows he risks a criminal prosecution if he reveals information to the alleged abuser that allows the abuser to figure out the reporter's identity is unlikely to conduct a very productive investigation. In this case, it was the disclosure of facts during investigation of the alleged abuse, not a tape recording of the reporter's voice in order to identify a false reporter, that allowed the subject to surmise the identity of the reporter. Under the circumstances of this case, we conclude that the DCF investigator did not unlawfully disclose Grayson's identity.
We are also dubious about the White court's implicit conclusion that disclosure of the identity of a person under investigation for a false report of child abuse could result in preventing prosecution of the false reporter.[3] Unlike cases in other contexts where an exclusionary rule or dismissal of charges based on prosecutorial misconduct is applied in order to deter police or prosecutorial misconduct, in this instance, the Legislature has already acted to fashion a deterrent to disclosure of the abuse reporter's identity by making disclosure a criminal offense. The Legislature's remedy for violating the confidentiality of the reporter of abuse is far more direct and effective than dismissal of the prosecution of the false reporter.
REVERSED and REMANDED.
TORPY, J., and GRAHAM, R.S., Associate Judge, concur.
NOTES
[1] See § 39.201(1)(b)6., Fla. Stat. (2006) (Law enforcement is required to provide their names to the hotline staff).
[2] We confess it was disconcerting to hear that the abuse reports are read verbatim to suspected abusers and that, according to Investigator Palmer, seventy-five to eighty percent of suspects figure out from the investigation who made the report. Investigator Palmer was not a very experienced investigator, however, and his testimony may not be accurate. The record is devoid of any rules, policies or procedures that DCF presumably has developed to address strategies for preserving the anonymity of the abuse reporter while performing a thorough investigation of hotline tips.
[3] We have taken note of the fact that the Legislature has made disclosure of confidential information a misdemeanor but has made it a felony to falsely report child abuse. See § 39.202(8), Fla. Stat. (2006).